938 P.2d 559

STATE of Hawai'i, Plaintiff–Appellee,

v.

Maxie QUITOG, Defendant-Appellant (Two Cases).

Nos. 19391, 19450.

Supreme Court of Hawai'i.

April 28, 1997.

Mariano V. Hernando (Hayden Aluli, with him on the briefs), Honolulu, for defendant-appellant Maxie Quitog.

James H.S. Choi, Deputy Prosecuting Attorney, on the briefs for plaintiff-appellee State of Hawai'i.

Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and SHIMABUKURO, Circuit Court Judge, in place of MOON, C.J., Recused.

LEVINSON, Justice.

The defendant-appellant Maxie Quitog has taken consolidated interlocutory appeals[1] from two orders of the First Circuit Court, the first—filed on November 1, 1995—denying his post-trial motion to dismiss Count I of the complaint, which charged him with the attempted second degree murder of George Stanley, "on double jeopardy grounds" and the second—filed on November 2, 1995—denying his post-trial motion to dismiss the same count "for violation of [the] double jeopardy clause and/or [based on] collateral estoppel" or, alternatively, for a judgment of acquittal "due to [the] prosecution's confession of error."

Quitog's appeals pose the following question of first impression in this jurisdiction: When, during final argument in a criminal prosecution for attempted second degree murder, (1) the prosecution abandons its initial position that the defendant is guilty as charged by (a) expressly conceding that he is not and (b) exhorting the jury to convict the defendant of one of several included offense as to which the trial court has instructed the jury, (2) the jury deadlocks by virtue of its inability to reach a unanimous agreement regarding the particular offense, if any, of which the defendant has been proved guilty, (3) the trial court declares a mistrial based upon "manifest necessity," and (4) the prosecution could have presented the jury with the theory that it subsequently wishes to advance on retrial, do the double jeopardy clauses of the United States or Hawai'i Con-

---

1. By order dated January 29, 1996, we consolidated Nos. 19391 and 19450 for briefing and disposition.

**130**

stitutions[2] bar a retrial of the defendant as to the originally charged offense of attempted second degree murder? We hold that the double jeopardy clause of the Hawai'i Constitution does.[3]

 Thus, for the reasons discussed *infra*, we (1) vacate the circuit court's orders in part, (2) instruct the circuit court to modify its orders so as to preclude Quitog from being retried for attempted second degree murder, while permitting a retrial with respect to any lesser included offense, *cf. State*

*v. Wallace*, 80 Hawai'i 382, 414, 910 P.2d 695, 727 (1996),[4] and (3) remand this case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

On March 22, 1994, Quitog was charged by complaint with attempted murder in the second degree in violation of Hawai'i Revised Statutes (HRS) §§ 705–500 and 707–701.5(1) (1993)[5] (Count I), criminal property damage

2. The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, *see Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" Analogously, article I, section 10 of the Hawai'i Constitution provides that no person "shall ... be subject for the same offense to be twice put in jeopardy[.]" We have not always construed the two clauses as coterminous. *See, e.g., State v. Lessary*, 75 Haw. 446, 457–59, 865 P.2d 150, 155–56 (1994) (ruling that interpretation given to double jeopardy clause of fifth amendment by United States Supreme Court does not adequately protect individuals from being "subject for the same offense to be twice put in jeopardy," thus requiring additional protection under Hawai'i Constitution).

3. ... [W]e have long recognized, "beginning with *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967), that 'as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution.' "
*State v. Arceo*, 84 Hawai'i 1, 28, 928 P.2d 843, 870 (1996) (quoting *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996)). Accordingly, we need not—and do not—address the question whether the double jeopardy clause of the fifth amendment to the United States Constitution would dictate the same result and express no opinion in that regard. Nevertheless, as demonstrated *infra* in this opinion, certain federal precedent regarding double jeopardy is highly instructive for purposes of our analysis.

4. For purposes of the double jeopardy clause contained in article I, section 10 of the Hawai'i Constitution, *see supra* note 2, "a lesser included offense is an offense that is (1) 'included' in a charged offense, within the meaning of [Hawai'i Revised Statutes (HRS)] § 701–109(4) (1993), and (2) of a class and grade lower than the greater [charged] offense, as described in HRS §§ 701–109(4)(a) and 701–109(4)(c)." *Wallace*, 80 Hawai'i at 415, 910 P.2d at 728 (some brackets in original and some added) (footnotes and

some quotation marks omitted); *see also State v. Malufau*, 80 Hawai'i 126, 134, 138, 906 P.2d 612, 620, 624 (1995). HRS § 701–109 (1993) provides in relevant part:

**Method of prosecution when conduct establishes an element of more than one offense.** ...

....

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

....

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

5. HRS § 705–500 (1993) provides: .

**Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.
HRS § 707–701.5 (1993) provides:

in the first degree in violation of HRS § 708–820 (1993) (Count II), and terroristic threatening in the first degree in violation of HRS § 707–716(1)(d) (1993) (Count III).[6] In particular, Count I charged in relevant part that:

> On or about the 8th day of March, 1994, in the City and County of Honolulu, State of Hawaii, MAXIE QUITOG . . . did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause the death of George Stanley, thereby committing the offense of Attempted Murder in the Second Degree. . . .

### A. Trial

The underlying events that gave rise to the complaint are irrelevant to the disposition of this appeal. What is relevant are certain events that occurred during Quitog's trial.[7] Jury selection took place on May 2, 1995. The deputy prosecuting attorney (DPA) and defense counsel delivered their opening statements the next day, and the evidentiary phase of the trial began.

Over the course of two days—May 3 and 4, 1995—, the prosecution moved thirteen exhibits into evidence and adduced the testimony of four witnesses—the complainant George Stanley, a Honolulu Police Department (HPD) evidence specialist, a general surgeon who treated Stanley for the injuries that Quitog inflicted, and an investigating HPD police officer—before resting its case-in-chief. Defense counsel then orally moved for a judgment of acquittal, which the trial court denied, ruling that the prosecution had made out a prima facie case as to all counts.

On May 4, 1995, Quitog adduced the testimony of his sister, moved a diagram into evidence, and rested his case. There were no rebuttal witnesses. The trial court excused the jury for the day, and defense counsel renewed his motion for judgment of acquittal, which the trial court again denied.

### B. Included Offense Instructions

■ On May 8, 1995, when the proceedings were reconvened, the trial court noted, and Quitog acknowledged, that the defense had requested (and the trial court had agreed to give) jury instructions regarding all available offenses that were supported by the record and were "included," for purposes of the Hawai'i Penal Code (HPC), within the

---

**Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656. HRS § 706–656(2) (1993) delineated the procedures by which defendants convicted of second degree murder and attempted second degree murder would "be sentenced to life imprisonment with possibility of parole." The legislature amended the statute in 1996 to harmonize HRS § 706–656(2) with HRS § 706–657 (Supp.1996), which implemented a discretionary "enhanced sentence for second degree murder," consisting of "life imprisonment without possibility of parole," under circumstances where the sentencing court "finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity or that the [defendant] was previously convicted of the offense of murder in the first degree or murder in the second degree in this State." 1996 Haw.Sess.L. Act 15, §§ 1 and 2 at 23. HRS § 706–657, as amended, does not apply to convictions of attempted second degree murder. HRS § 707–701 (1993) is the statutory proscription against the offense of murder in the first degree.

6. Quitog's convictions of the offenses charged in Counts II and III were the subject of a separate appeal—No. 19726—and are not at issue here. We summarily affirmed these two convictions on March 25, 1997. See Summary Disposition Order No. 97–25 (Haw. Mar. 25, 1997).

7. The only transcripts that have been made a part of the record on appeal relate to (1) the DPA's closing and rebuttal arguments, (2) the parties' discussions with the trial court regarding the jury's written communications received during its deliberations and the trial court's responses to those communications, (3) the receipt of the jury's verdicts in open court, (4) the trial court's declaration of a mistrial as to Count I and discharge of the jury, (5) the scheduling of a sentencing date, (6) Quitog's referral to the Adult Probation Division for a presentence investigation report, and (7) the hearings on Quitog's post-trial motions. Accordingly, most of the factual recitation that follows is based on the trial court's minutes, which the parties stipulated into evidence in connection with Quitog's post-trial motions and are thus part of the record on appeal.

offense of attempted second degree murder, even though some were "inconsistent" with others. Thus, by agreement of the parties, the trial court ultimately instructed the jury as to the "included" offenses of: (1) "attempted manslaughter" by virtue of the defendant's reckless conduct (Court's Instruction No. 33);[8] (2) assault in the first degree in violation of HRS § 707–710 (1993) (State's Instruction No. 6);[9] (3) three forms of assault in the second degree in violation of HRS §§ 707–711(1)(a), –711(1)(b), and –711(1)(d) (1993) (Court's Instruction Nos. 34, 35, and 36);[10] (4) two forms of assault in the third degree in violation of HRS §§ 707–712(1)(a) and –712(1)(b) (1993) (Court's Instruction Nos. 37 and 37A);[11] and (5) reckless endangering in the second degree in violation of HRS § 707–714. (1993) (Court's Instruction No. 38).[12]

## C. *Prosecution's Closing Argument*

The parties and the trial court having reached agreement regarding the included offense instructions that would be read to the jury, the case was called and the DPA delivered his closing argument. The following excerpts are germane to the present appeal:

> [BY THE DPA]: Good morning, members of the jury.
>
> What I am about to tell you will probably surprise many, if not all of you.

---

8. The HPC "does not recognize the offense of attempted manslaughter based upon a defendant's reckless conduct and . . . a jury instruction purporting to describe that nonexistent offense [is] erroneous *per se.*" *State v. Loa,* 83 Hawai'i 335, 357, 926 P.2d 1258, 1280 (1996) (citing *State v. Holbron,* 80 Hawai'i 27, 43–45, 904 P.2d 912, 928–29, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995)). Therefore, "[i]t is self-evident that, being nonexistent, attempted reckless manslaughter *cannot* be 'included' within attempted . . . murder for purposes of HRS § 701–109(4)." *Id.* at 358, 926 P.2d at 1281 (emphasis in original); *see also supra* note 4.

9. HRS § 707–710 provides:
 **Assault in the first degree.** (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.
 (2) Assault in the first degree is a class B felony.

10. HRS § 707–711 provides in relevant part:
 **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
 (a) The person intentionally or knowingly causes substantial bodily injury to another;
 (b) The person recklessly causes serious bodily injury to another person; [or]
 . . . .
 (d) The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]
 . . . .
 (2) Assault in the second degree is a class C felony.
 Given the criteria set forth in HRS §§ 701–109(4)(a) and (c), *see supra* note 4, we express no opinion as to whether assault in the second degree in violation of HRS § 707–711(1)(d), which involves the use of "a dangerous instrument," is an offense "included in" the charged offense of attempted second degree murder, inasmuch as

the disposition of this appeal does not require us to reach the issue. *But cf. State v. Kinnane,* 79 Hawai'i 46, 52–56, 897 P.2d 973, 979–83 (1995) (holding, *inter alia,* that sexual assault in the fourth degree in violation of HRS § 707–733(1)(a), which includes the element of "sexual contact" and presupposes that the person subjected thereto is "not married to" the defendant, is an included offense, within the meaning of HRS § 701–109(4)(c), of attempted sexual assault in the second degree in violation of HRS §§ 705–500 and 707–731(1)(a), which can be perpetrated against *any* other person).

11. HRS § 707–712 provides:
 **Assault in the third degree.** (1) A person commits the offense of assault in the third degree if the person:
 (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
 (b) Negligently causes bodily injury to another person with a dangerous instrument.
 (2) Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into be mutual consent, in which case it is a petty misdemeanor.
 For the same reasons expressed *supra* at note 10, we express no opinion as to whether assault in the third degree in violation of HRS § 707–712(1)(b), which involves the use of "a dangerous instrument," is "included in" the charged offense of attempted second degree murder.

12. HRS § 707–714 (1993) provides in relevant part:
 **Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person engages in conduct which recklessly places another person in danger of death or serious bodily injury.
 . . . .
 (3) Reckless endangering in the second degree is a misdemeanor.

[*Quitog*] is charged with Attempted Murder in the Second Degree, among other things. He *is not guilty of Attempted Murder in the Second Degree.*

One stab wound to the abdomen is not enough to prove that ... Quitog intended to kill George Stanley. Now, you may think, wait, aren't you the Prosecutor? Why are you saying this?

That one stab wound is not enough to prove that ... Quitog intended to kill George Stanley, but it is enough to prove beyond a reasonable doubt that he intended to cause what the law calls serious bodily injury and [Quitog], therefore, is guilty instead of Assault in the First Degree, which is an option available to you.

. . . .

Finally, we reach the stabbing of George Stanley. What we have here is a decision tree. This is the type of analysis you should go through in deciding the stabbing portion of this case.

Now, as I argued to you at the outset, [*Quitog*] *is not guilty of Attempted Murder because there was no intent to kill. I'll admit that. The [prosecution] does not seek a conviction of Attempted Murder in the Second Degree.* Well, let me tell you something else. *He's also not guilty of Attempted Manslaughter because Attempted Manslaughter requires reckless conduct.*[13]

. . . .

*He's guilty of Assault in the First Degree.* He's guilty of intentionally or knowingly causing serious bodily injury. Now, what does that mean?

. . . .

[*Quitog*] intentionally or knowingly caused serious bodily injury to George Stanley; and therefore, he *is guilty of Assault in the First Degree.*

*Don't convict him of Attempted Murder in the Second Degree, although he's charged with that.* He didn't intend to kill George Stanley. And *to convict him of Attempted Murder in the Second Degree wouldn't be justice.*

But don't convict him either of Assault in the Second Degree or Assault in the Third Degree because he did much more than that; and that would not be justice, either[,] because the injuries he created and what was on his mind, his state of mind, was more than recklessly; was more than substantial bodily injury; and was more than bodily injury. That's why *the [prosecution] asks you to convict him of Assault in the First Degree.*

. . . .

Thank you.

(Emphases added.) Defense counsel responded with a seventeen-minute closing argument,[14] followed by three minutes of rebuttal by the DPA. The trial court then instructed the jury as to the law of the case.

### D. *The Jury's Deliberations, Communications, And Verdicts, And The Trial Court's Declaration Of A Mistrial As To Count I*

The jury commenced its deliberations at 12:00 p.m. on May 8, 1995. Shortly after 4:10 p.m., the bailiff presented the trial court with a written jury communication, which inquired, "How does the law interpret the explanation of Assault in the First Degree regarding bodily injury? Does the 'cause' of

---

13. Quitog could not have been guilty of "attempted reckless manslaughter" because that offense is nonexistent under the HPC. *See supra* note 8.

14. Defense counsel's closing argument is not part of the record in this case. Apparently, neither the DPA nor defense counsel requested that the trial court require the court reporter to transcribe it. *See State v. Moriwaki,* 71 Haw. 347, 357, 791 P.2d 392, 397 ("Although HRS § 606–12 does not require the recording of argument, we now hold that where a party makes a timely request, the trial court must order that closing argument be recorded." (Citation omitted.)), *reconsideration denied,* 71 Haw. 665, 833 P.2d 900

(1990); *State v. Prince,* 67 Haw. 231, 235, 683 P.2d 1217, 1220 (1984) ("There is nothing in HRS § 606–12 that precludes the recording of a closing argument. Counsel has a privilege to request in advance that closing argument be recorded[.]"); HRS § 606–12 (1993) ("The duties of each court reporter shall be to ... write down all the testimony of witnesses in shorthand, together with the proceedings and objections of counsel, exclusive of argument, the rulings of the court, charge to the jury, and any other matter which the court may require the reporter to report.").

bodily injury apply to the intent of the assailant or to the outcome of the injury?" (Emphasis added.) [15] The communication closed with a page reference to the trial court's instruction regarding the elements of first degree assault. At 4:27 p.m., after conferring with counsel, the trial court returned the communication to the jury with the typed response, "Please refer to the jury instructions." The jury was released for the day at 4:30 p.m.

On May 9, 1995, the jury resumed its deliberations at 9:00 a.m. The trial day was cut short by a bomb threat, which necessitated an evacuation of the courthouse at 2:10 p.m. The jury was released for the remainder of the day at 3:00 p.m.

On May 10, 1995, the jury once again resumed its deliberations at 9:00 a.m. Forty-five minutes later, the trial court received a further written communication from the jury, which advised as follows:

15. Translated into legal terms, the jury was obviously inquiring whether the state of mind requisite to the commission of first degree assault applied to the *result*—i.e., "serious bodily injury"—of the defendant's conduct, as well as to the conduct itself. *See infra* notes 16 and 17.

16. As noted *supra*, the trial court read State's Instruction No. 6 to the jury, which related to the included offense of assault in the first degree, in violation of HRS § 707–710(1). State's Instruction No. 6, as modified by agreement, provided:

 *If and only if you find the Defendant Maxie Quitog not guilty of Attempted Murder in the Second Degree, or you are unable to reach a unanimous verdict as to this offense,* then you must determine whether the Defendant Maxie Quitog is guilty or not guilty of the included offense of Assault in the First Degree.

 A person commits the offense of Assault in the First Degree if he *intentionally or knowingly* causes *serious bodily injury* to another person.

 There are two material elements of this offense, each of which the prosecution must prove beyond a reasonable doubt.

 These two elements are:
 1. That the Defendant Maxie Quitog caused *serious bodily injury* to George Stanley; and
 2. That the Defendant Maxie Quitog did so *intentionally or knowingly.*

 (Emphases added.) The trial court likewise instructed the jury regarding three forms of the included offense of assault in the second degree, in violation of HRS § 707–711(1). In this connection, Court's Instruction Nos. 34 and 35, which were given by agreement, provided in relevant part:

Jury instructions provide insufficient definition and explanation of "reckless." *The jury requests further explanation, definition and/or example regarding reckless in order to distinguish between Assault 1 and Assault 2. The jury is hung without further information or understanding.*

(Emphasis added.) [16] At 10:05 a.m., after conferring with counsel, the trial court returned the communication to the jury with the typed response, "No further definition of Reckless can be provided.[17] If the Court gives the jury additional time to deliberate, can the jury reach a unanimous verdict?" At 10:40 a.m., the jury responded to the trial court's inquiry with its last written communication, which stated, "No. The jury has reached 2 out of 3 verdicts. The jury is hung."

At 11:17 a.m. on May 10, 1995, the jury was returned to the courtroom, at which time the following colloquy transpired:

 *If and only if you find the Defendant Maxie Quitog not guilty of Assault in the First Degree or you are unable to reach a unanimous verdict as to this offense,* then you must determine whether Maxie Quitog[ ] is guilty or not guilty of the included offense of Assault in the Second Degree. There are three ways a person can commit the offense of Assault in the Second Degree.

 . . . .

 2. A person commits the offense of Assault in the Second Degree if he *recklessly* causes *serious bodily injury* to another person.

 There are two material elements of the offense of Assault in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

 These two elements are:
 1. That the Defendant, Maxie Quitog, caused *serious bodily injury* to George Stanley; and
 2. That the Defendant, Maxie Quitog, did so *recklessly.*

 (Emphases added.) Assault in the first degree in violation of HRS § 707–701(1), *see supra* note 9, and assault in the second degree in violation of HRS § 707–711(1)(b), *see supra* note 10, are identical except as to the states of mind required for the commission of the respective offenses.

17. The trial court had read Court's Instruction Nos. 22, 23, and 24—which were modified versions of Hawai'i Standard Jury Instructions Criminal (HAWJIC) 6.02, 6.03, and 6.04—to the jury. These instructions defined "intentionally," "knowingly," and "recklessly" pursuant to the provisions of HRS §§ 702–206(1), –206(2), and –206(3) (1993).

THE COURT: Let the record reflect the presence of the jury, counsel, and the defendant.

Will the foreperson please stand and state your name.

THE FOREPERSON: [The foreperson stated her name.]

THE COURT: And has the jury reached a verdict?

THE FOREPERSON: On two of three counts.

THE COURT: Which counts?

[THE FOREPERSON:] Count II and Count III.

THE COURT: And you have not been able to reach a unanimous verdict as to Count I; is that right?

THE FOREPERSON: That's correct, Your Honor.

THE COURT: If the Court were to give you additional time to deliberate, would you be able to reach a unanimous verdict regarding Count I?

THE FOREPERSON: No, Your Honor, we would not.

The jury then returned guilty verdicts as to Counts II and III. After polling the jury regarding the unanimity of the two verdicts, the court ruled that, "[a]s to Count I, based on the inability to reach a unanimous verdict despite, I believe, two and-a-half days of deliberation, the Court will declare a mistrial as to Count I, finding that there is a manifest necessity." The jury was thereupon discharged, and the trial court referred Quitog to the Adult Probation Division for a presentence diagnosis and report and scheduled a sentencing hearing regarding Counts II and III to take place on August 11, 1995.

### E. *Quitog's Motions To Dismiss Count I*

On August 2, 1995, Quitog filed a motion to dismiss Count I "for violation of [the] double jeopardy clause and/or collateral estoppel," or, alternatively, "for judgment of acquittal due to prosecution's confession of error." Observing that "[t]he underlying sentiment for applying double jeopardy principles rests on the premise that it is inherently unfair to allow the government with all of its resources and power to have more than one bite at the apple," Quitog argued, *inter alia,* that because the DPA "himself conceded that the evidence could not support an attempted murder conviction, the [trial] court must dismiss Count I of the Complaint. Otherwise, the failure to do so would violate the principles that the double jeopardy clauses ... were designed to protect."

On August 5, 1995, Quitog filed a second motion to dismiss Count I. In this motion, Quitog urged that "the retrial of Count I should be dismissed on Double Jeopardy ground[s]" because (1) he neither "requested nor initiated the mistrial" and, in Quitog's view, (2) the attempted second degree murder charge had been brought "in bad faith," as reflected in retrospect by the DPA's concession that he was not guilty of that offense.[18]

Quitog's two motions were consolidated for hearing, which commenced on September 8, 1995. Quitog called the DPA who had tried the case against him as a witness, and the following colloquy transpired:

[BY DEFENSE COUNSEL:] ... [W]hat is your present employment, please?

[BY THE DPA:] Deputy Prosecutor, City and County of Honolulu.

Q. And how long have you been so employed?

A. Eight years.

Q. And prior to that, have you had any other experience as an attorney?

A. I was in civil practice for three years.

. . . .

Q. Are you still with the Prosecutor's Office?

A. Yes.

Q. You tried this case, State of Hawaii versus Maxie Quitog, on or about the first week of May of 1995; is that correct?

A. I tried the case. I don't recall the date.

---

**18.** We hold that Quitog's "bad faith" argument is without merit. Even in the absence of a trial transcript, it is apparent that Count I of the complaint was supported by probable cause.

Q. And one [count] of [the complaint in] the case concerns the charge of Attempted Murder in the Second Degree?

A. Yes.

Q. And I understand that after you ... closed your case, there was a chambers conference that you had attended along with the Defense with [the trial court]?

. . . .

A. Yes.

Q. And it is my further understanding that prior to that chambers conference, you made certain representations to the Defense ... in regards to dropping the count of Attempted Murder in the Second degree?

A. Not dropping it. I thought of reducing it.

Q. Would you please provide for the record exactly what that offer or representation was to the Defense.

A. My recollection was that [it was] trying to work out a deal whereby [the prosecution] would reduce the charge of Attempted Murder to Assault in the First Degree.

Q. And did you seek to get approval from anyone from your office?

A. Yes. That was denied.

. . . .

Q. ... You took a certain proposal to your supervisors, and why did you do that?

A. I thought it was fair.

Q. And can you explain to the Court why you thought it was fair.

A. Based on the evidence, I thought [it] was fair.

Q. Did you also feel that it was consistent with the state of the evidence, that there was insufficient evidence as to the [charge of] Attempted Murder in the Second Degree?

A. I think it was a borderline case, but in looking at the entire case, the reasons for what happened, the nature of the injury, I thought an Assault One would be something fair to cop to.

Q. *Did you also feel that there was insufficient evidence to sustain the Attempted Murder in the Second Degree charge?*

A. *Yes.*

Q. And you told that to your supervisor?

A. Yes.

Q. *And you also told it to the jury?*

A. *Yes, in closing argument.*

Q. You feel that your position is consistent with the ethical rule that you are bound by?

A. Referring to my role ... as a Prosecutor to seek justice?

Q. Yes.

A. Yes.[19]

---

19. *"The prosecution has a duty to seek justice,* to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." *Moriwaki,* 71 Haw. at 354, 791 P.2d at 396 (citations and internal quotation marks omitted) (emphasis added). In this connection, the preamble to the Hawai'i Rules of Professional Conduct (HRPC) delineates "a lawyer's responsibilities," including those of a public prosecutor, in relevant part as follows:

[1] A lawyer is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice.

. . . .

[6] Many of a lawyer's professional responsibilities are prescribed in the [HRPC], as well as substantive and procedural law. However, a lawyer is also guided by personal conscience and the approbation of professional peers. A lawyer should strive to attain the highest level of skill, to improve the law and the legal profession and to exemplify the legal profession's ideals of public service.

. . . .

[8] In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an upright person while earning a satisfactory living. The [HRPC] prescribe terms for resolving such conflicts. Within the framework of these rules many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the rules.

Comment [1] to HRPC Rule 3.8, relating to "performing the duty of public prosecutor or other government lawyer," speaks, in relevant part, directly to the unique responsibilities of a prosecuting attorney:

Q. Now, in that chambers conference when you basically tried to make a representation to the Defense about reducing that charge, did you make ... known to [the trial court] your offer to reduce the charge from Attempted Murder in the Second Degree to Assault One?

A. I believe I did, yes.

Q. Can you ... place on the record exactly what happened at that chambers conference?

A. I believe I indicated my attempt to resolve the case through a plea agreement by seeking an Assault in the First Degree charge, and then I think I also invited the [trial] [c]ourt to enter a Judgment of Acquittal as to the Attempted Murder in the Second Degree count and let me go to closing argument on Assault in the First Degree, and my recollection was that [that] was denied because, given the law, in other words, looking at the evidence in the light most favorable to the [prosecution], that there was sufficient evidence at that time to allow the charge to go to the jury.

Q. This is at the end of your case?

A. Yes.

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense.

ABA Prosecution Function Standard 3–1.2 (1993) provides in relevant part:

**The Function of the Prosecutor[.]**
....

(b) The prosecutor is an administrator of justice, an advocate, and an officer of the court; the prosecutor must exercise sound discretion in the performance of his or her functions.

(c) The duty of the prosecutor is to seek justice, not merely to convict.

ABA Prosecution Function Standard 3–5.8(a) (1993) provides that, "[i]n closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the

Q. The Defense had not put on its witnesses?

A. Right.
....

Q. ... [Y]ou basically were stuck with not being able to fulfill what you believe was your ethical obligation as a Prosecutor to seek justice, correct?

A. Well, I was not allowed to go to closing argument with what I thought was a proper charge.

Q. But you went to closing argument and *you told the jury that it should find for the Defense not guilty as to Count One, Attempted Murder in the Second Degree?*

A. *Right, but guilty of Assault in the First Degree.*

Q. And you stand by that decision because you feel that it fulfills your obligation to seek justice and be fair?

A. I stand by that decision, but my decision is not the decision of my office. I need permission from my supervisor before a plea approval can be approved.

Q. You did need approval to state your position to the jury, correct?

evidence or mislead the jury as to the inferences it may draw." The commentary on Standard 3–5.8 states in relevant part:

The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.
....

... It has long been established that a lawyer may not knowingly ... in argument assert as a fact that which has not been proved. (Footnote omitted.)

The record in this case reflects that the DPA scrupulously discharged his duty, as *he* subjectively perceived it, "to seek justice." As he made clear in his testimony *infra*, however, there may have been some tension between the discharge of that duty and the internal policies of the Office of the Prosecuting Attorney regarding the chain of command. We need not address or resolve that tension in this appeal.

A. Well, frankly, I got into trouble with my office for that.

Q. That's a different matter. The question I have is, based upon your understanding of the scope of your responsibility as a [DPA], you have the discretion to make the kind of call that you made on May 8, 1995, when you told the jury that Mr. Quitog is not guilty of Attempted Murder in the Second Degree, right?

A. No, I don't have that discretion. I did it contrary to what my office wanted because I believed that that was the proper charge and I believed that, in my role to seek justice, that was the proper thing to do. I went out on a limb.

Q. I note that you are not going to be trying this case . . . again?

A. Yes.

Q. And it is your personal conviction not to try this case and get another deputy to stand in here?

A. . . . I didn't think it would be proper given my office's position and my belief as to what the proper charge would be for me to proceed with this case.

[BY DEFENSE COUNSEL]: Thank you, Mr. [DPA]. No further questions.

[BY SUBSTITUTE DPA]: No further questions. No questions at all.

(Emphases added.)

The substitute DPA declined either to call any witnesses or to advance any oral argument in opposition to Quitog's motions to dismiss Count I, opting instead to "submit . . . on the record." Defense counsel's oral argument in support of the motions included the following:

I have heard of cases . . . where, at opening statement, . . . certain positions had been taken by the Plaintiff where there is . . . insufficiency of the evidence, . . . [t]rial [c]ourts have been affirmed in dismissing counts right at the gecko [sic; probably "get-go"]. In this case, there is more than that. There is a [DPA] who felt . . . at the end of . . . his case[ ] that the charge should not go to the jury; however, there was a lesser [included offense] that could go.

There was an attempt, at least, to put forward before the [trial court,] as well as before his supervisors[,] an attempt to seek justice[;] and in this [DPA's] viewpoint, . . . there was not enough evidence to go to the jury. The [trial court] denied the motion in the case. The [trial court] did not grant it as a Motion for Judgment of Acquittal at the end of this case, and Defense proceeded, and there was another motion . . . as to Judgment of Acquittal.

More importantly, Judge, . . . *at the end of the case on both sides, this [DPA] took [a] position that [is] inconsistent with the [substitute DPA's] position now. [The DPA], based upon his view of his ethical obligation, told the jury that Mr. Quitog is not guilty of Count One, Attempted Murder in the Second Degree. . . .*

. . . [I]n my view, Judge, I have never seen a case where a[DPA] has done such a right thing and has told the jury[,"T]hat is justice."]

And it troubles me to see it . . . proceed again within the Government that took that position [with] the jury [in] the first trial. . . . *[T]o have another . . . jury . . . review this issue is very, very troubling in light of the position taken by the Government . . . .*

. . . .

. . . [I]t appears to me[,] just as a matter of law of the case, that *the [prosecution], after taking a position, should be precluded from changing its position in this case*

. . . .

(Emphases added.)

The hearing was continued to September 22, 1995, at which time the trial court orally denied Quitog's motions to dismiss Count I and scheduled the matter for retrial, ruling as follows:

The court . . . denies both of those motions. First addressing double jeopardy, [*Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 889 P.2d 705 (1995),] says double jeopardy protects against three distinct abuses. A second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, or multiple punishments for the same offense. And none of those situations is

present in this case. We had a hung jury. The Court declared a mistrial[,] finding that there [was] a manifest necessity because of the hung jury.

In terms of collateral estoppel, that is sort of a corollary to the double jeopardy. And looking at cases both in this jurisdiction and other jurisdictions, as well as the Federal Court, I don't believe collateral estoppel prevents the [prosecution] from retrying a defendant when there has been a hung jury.

The same holds true when you're dealing with asking for a judgment of acquittal due to a[n] alleged prosecution's confession of error. I think the [prosecution's memorandum] in opposition addresses that in terms of the difference between confessing to facts and confessing to law and those distinctions. The Court finds that the prosecution's ... memorandum in opposition is persuasive in that regard.

So both of the motions regarding double jeopardy ... are denied.

The trial court' findings of fact and conclusions of law set forth in its written orders, filed on November 1 and 2, 1995, denying Quitog's motions substantially tracked the reasoning of its oral ruling.

Thereafter, Quitog filed the present interlocutory appeals.[20]

## II. STANDARD OF REVIEW

... We answer questions of constitutional law "by exercising our own independent judgment based on the facts of the case." *State v. Trainor*, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citations and internal quotation marks omitted); *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996) (citation, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900

(1995) (citing *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995), and *State v. Gaylord*, 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995)); *State v. Baranco*, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional right against double jeopardy would be violated unless indictment dismissed is question of law, reviewed under right/wrong standard); *In re [John] Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution as applied to states through fourteenth amendment and by article I, section 4 of Hawai'i Constitution are questions freely reviewable on appeal).

*State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996).

## III. DISCUSSION

As noted *supra* in section I, Quitog argued in support of his post-trial motions to dismiss Count I of the complaint, that, "after taking [the] position" in his first trial that he was *not* guilty of the charged offense of attempted second degree murder, the prosecution "should be precluded" by principles of double jeopardy "from changing its position" thereafter. Quitog's argument raises a question of first impression in this jurisdiction, which we now address in some detail.

A. *Inasmuch As (1) Principles Of Double Jeopardy Serve A Constitutional Policy Of Finality For The Defendant's Benefit, (2) The Prosecution Pursued The Deliberate Trial Strategy Of Abandoning Its Quest For An Attempted Second Degree Murder Conviction In Count One And Affirmatively Seeking A Conviction Of The Included Offense Of First Degree Assault, (3) Quitog's First Trial Terminated Without A Verdict On Count I, And (4) The Prosecution Could Have Presented The Original Jury With*

---

20. ... While we generally require the trial court's permission before bringing an interlocutory appeal, we have held that such permission is not necessary where the trial court denies a pretrial motion to dismiss an indictment [or complaint] on double jeopardy grounds.

*State v. Minn*, 79 Hawai'i 461, 464, 903 P.2d 1282, 1285 (1995) (citing *State v. Baranco*, 77 Hawai'i 351, 354–55, 884 P.2d 729, 732–33 (1994)).

*The Theory That It Now Wishes To Advance On Retrial, It Therefore Follows That Article I, Section 10 Of The Hawai'i Constitution Bars The Prosecution From Requiring Quitog To "Run The Gauntlet" A Second Time With Respect To The Offense Originally Charged In Count One.*

1. *General underpinnings of the double jeopardy clause*

We begin our analysis with some basic observations regarding the constitutional principles and policies underlying the double jeopardy clause of article I, section 10. In *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), which we cited with approval in *Wallace*, 80 Hawai'i at 413, 910 P.2d at 726, the United States Supreme Court explained that

> [t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow "the State ... to make repeated attempts to convict an individual for an alleged offense," since "[t]he constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Green v. United States*, 355 U.S. 184, 187[, 78 S.Ct. 221, 223, 2 L.Ed.2d 199] (1957); *see Serfass v. United States*, 420 U.S. 377, 387–388[, 95 S.Ct. 1055, 1061–63, 43 L.Ed.2d 265] (1975); *United States v. Jorn*, 400 U.S. 470, 479[91 S.Ct. 547, 554, 27 L.Ed.2d 543] (1971).

*Burks*, 437 U.S. at 11, 98 S.Ct. at 2147 (ellipsis points and brackets in original) (footnote omitted).[21] Moreover, the Court thoroughly reviewed "[t]he origin and history" of the clause in *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).

The constitutional provision had its origin in the three common-law pleas of *autrefois acquit, autrefois convict*, and pardon. These three pleas prevented the retrial of a person who had previously been acquitted, convicted, or pardoned for the same offense. As this Court has described the purpose underlying the prohibition against double jeopardy:

> "The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green, supra*, at 187–188[78 S.Ct. at 223].

These historical purposes are necessarily general in nature, and their application has come to abound in often subtle distinctions which cannot by any means be traced to the original three common-law pleas referred to above.

Part of the difficulty arises from the development of other protections for criminal defendants in the years since the adoption of the Bill of Rights. At the time the [f]ifth [a]mendment was adopted, its principles were easily applied, since most criminal prosecutions proceeded to final judgment, and neither the United States nor the defendant had any right to appeal an adverse verdict. See Act of Sept. 24, 1789, ch. 20, § 22, 1 Stat. 84. The verdict in such a case was unquestionably final, and

---

**21.** In *Burks*, 437 U.S. at 18, 98 S.Ct. at 2150–51, the United States Supreme Court held that the double jeopardy clause " 'precludes a second trial once the reviewing court has found the evidence [adduced at trial] legally insufficient ...' [hereinafter, 'the *Burks* rule']," which the *Burks* Court distinguished from "reversal for 'trial error,' " to support a defendant's conviction. *Wallace*, 80 Hawai'i at 413–14 & n. 30, 910 P.2d at 726–27 & n. 30 (some brackets in original and some added) (footnote omitted); *see also Malufau*, 80 Hawai'i at 132–33, 906 P.2d at 618–19. Inasmuch as the outcome of the present appeal turns neither on the "legal sufficiency of the evidence" to support Quitog's attempted second degree murder conviction nor on the presence of "trial error," as that term was contemplated in *Burks* and *Wallace*, we emphasize that the *Burks* rule is not implicated in this case.

could be raised in bar against any further prosecution for the same offense.

Soon thereafter, Congress made provision for review of certain criminal cases by this Court, but only upon a certificate of division from the circuit court, and not at the instigation of the defendant. Act of Apr. 29, 1802, ch. 31, § 6, 2 Stat. 159. It was not until 1889 that Congress permitted criminal defendants to seek a writ of error in this Court, and then only in capital cases. Act of Feb. 6, 1889, ch. 113, § 6, 25 Stat. 656. Only then did it become necessary for this Court to deal with the issues presented by the challenge of verdicts on appeal.

*Id.* at 87–88, 98 S.Ct. at 2192 (footnote omitted).

 Thus, in the typical appeal invoking the constitutional protection,

[w]e have often recognized that there are three separate and distinct aspects to the protections offered by the double jeopardy clause. "Double jeopardy protects individuals against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *[Higa],* 79 Hawai'i [at] 5, 897 P.2d [at] 932 . . . (citing *State v. Lessary,* 75 Haw. 446, 454, 865 P.2d 150, 154 (1994), and *United States v. Halper,* 490 U.S. 435, 440[, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487] (1989)).

*State v. Ontiveros,* 82 Hawai'i 446, 450, 923 P.2d 388, 392 (1996); *see also State v. Tuipuapua,* 83 Hawai'i 141, 148, 925 P.2d 311, 318 (1996). For purposes of applying the protection, "it is generally accepted that in jury trials, jeopardy attaches when the jury is empaneled and sworn[.]" *Baranco,* 77 Hawai'i at 355, 884 P.2d at 733 (citation, brackets, and internal quotation marks omitted); *see also State v. Lam,* 75 Haw. 195, 201, 857 P.2d 585, 589 (1993). Correlatively, jeopardy comes to an end when "the trial court . . .

accept[s] the verdict or discharge[s] the jury." *State v. Manipon,* 70 Haw. 175, 178, 765 P.2d 1091, 1093 (1989).

However, even when a trial ends without a judgment, a defendant's

constitutional right to "have his trial completed by a particular tribunal" still exists. *Arizona v. Washington,* 434 U.S. 497, 503[, 98 S.Ct. 824, 829, 54 L.Ed.2d 717] (1977).

> The reasons why this "valued right" merits constitutional protection are worthy of repetition. *Even if the first trial is not completed, a second prosecution may be grossly unfair.*[22] It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. *The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.*

*Id.* at 503–05[, 98 S.Ct. at 829–30]. *See also State v. Moriwake,* 65 Haw. 47, 51–52, 647 P.2d 705, 709–10 (1982). Generally, "[a] State may not put a defendant in jeopardy twice for the same offense." *Washington,* 434 U.S. at 503[, 98 S.Ct. at 829] (citing *Benton v. Maryland,* 395 U.S. 784[, 89 S.Ct. 2056, 23 L.Ed.2d 707] (1969)); *see* U.S. Const. amend. V; *see* Hawai'i Const. art. I, § 10.

While the 5th and 14th amendments of the United States Constitution and Article I of the Hawai'i Constitution protect a defendant from being twice tried for the same crime, "retrial is not automatically barred [by the double jeopardy clause] when a criminal proceeding is terminated without finally resolving the merits of the

---

22. For example, the double jeopardy clause "can preclude retrial after prosecutorial misconduct causes a mistrial." *Tuipuapua,* 83 Hawai'i at 148, 925 P.2d at 318 (citing *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)); *see also Scott,* 437 U.S. at 94, 98 S.Ct. at 2195 ("But '[t]he Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions.'" (Quoting *Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081.)).

charges against the accused." *Washington*, 434 U.S. at 505[, 98 S.Ct. at 830]. *Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded,* and because those circumstances *do not invariably create unfairness to the accused, his valued right to have the trial be concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.* *Moriwake*, 65 Haw. at 52, 647 P.2d at 710 (citing *Washington*, 434 U.S. at 505[, 98 S.Ct. at 830]). Case law requires a balance between the rights of the accused and the public interest. Both are vitally important to our judicial system, and each must be considered in the context of a trial court's rulings.

*Lam*, 75 Haw. at 199–200, 857 P.2d at 588–89 (brackets in original) (emphases added). *See also State v. Minn*, 79 Hawai'i 461, 464, 903 P.2d 1282, 1285 (1995); *United States v. Cavanaugh*, 948 F.2d 405, 414 (8th Cir.1991) (noting that, although protections against second prosecution for same offense after acquittal or conviction and against multiple punishments for same offense are primary purposes of the double jeopardy clause, "the [United States Supreme] Court has emphasized that there is 'the separate but related interest of a defendant in avoiding multiple prosecutions even where no final determination of guilt or innocence has been made'" (quoting *Scott*, 437 U.S. at 82, 98 S.Ct. at 2189)). Thus, "'[q]uestions regarding retrial after the discharge of a jury without a verdict are not to be decided by a rigid applica-

tion of mechanical formulae.'" *Cavanaugh*, 948 F.2d at 416 (quoting *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034, 1043 (3d Cir.1975)).

▮ "Where a mistrial is declared without the consent of the defendant and without manifest necessity, reprosecution will be barred by double jeopardy." *Minn*, 79 Hawai'i at 464, 903 P.2d at 1285 (citing *Lam*, 75 Haw. at 201, 857 P.2d at 589). "[T]he declaration of a mistrial is discretionary on the part of a trial court. Therefore, we review the trial court's action under an abuse of discretion standard." *Id.* (citing *Lam*, 75 Haw. at 201, 857 P.2d at 589, and *Moriwake*, 65 Haw. at 52, 647 P.2d at 710).

▮ "Consent to a mistrial may be explicit or implicit." *Lam*, 75 Haw. at 201, 857 P.2d at 589. "Explicit consent arises when a defendant voluntarily moves or argues for a mistrial.[23] In such a situation the defendant may be retried." *Id.* at 201–02, 857 P.2d at 589 (citing *State v. Pulawa*, 58 Haw. 377, 381–82, 569 P.2d 900, 904–05 (1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978)). Examples of cases involving "implicit" consent include

> those where the defendant failed to raise a double jeopardy claim at trial, or *in a timely manner*; [24] where a defendant pleaded no contest to a criminal charge; where a defendant sought a continuance at trial; where a defendant chose to oppose [the] prosecution's motion to consolidate; and where a defendant sought a new trial after being convicted.

*Id.* at 202, 857 P.2d at 589 (citations and internal quotation signals omitted) (emphasis added).

---

23. Quitog did neither in the present case.

24. Quitog raised his double jeopardy claim "in a timely manner" by way of his two post-trial motions to dismiss Count I. Thus, the present appeal is distinguishable from such prior decisions as *State v. Miyazaki*, 64 Haw. 611, 645 P.2d 1340 (1982), and *State v. DeCenso*, 5 Haw.App. 127, 681 P.2d 573 (1984). In *Miyazaki*, the defendant

> failed to raise any double jeopardy objection at any time *before [his] appeal* despite having numerous opportunities to do so. A timely objection could certainly have been made sometime during the four-and-a-half-month pe-

riod *between the reindictment and [the defendant's] second trial*. Equally clear is the fact that a timely objection could have been interposed *before or during that second trial* when the [defendant's] double jeopardy rights were actually being affected.

64 Haw. at 619, 645 P.2d at 1347 (emphases added). In *DeCenso*, the defendant "succeed[ed] during trial in having a charge against him dismissed without submitting the question of his guilt or innocence to the judge or jury," and, accordingly, "the double jeopardy clause [did] not bar a second trial of that charge." 5 Haw. App. at 136, 681 P.2d at 580 (citations omitted).

■■ Even in the absence of a defendant's express or implied consent to a mistrial,

> principles of double jeopardy pose no bar to reprosecution after discharge of a jury if there was a manifest necessity for the mistrial, or the ends of public justice would otherwise be defeated. Manifest necessity is defined as a sudden and overwhelming emergency beyond [the] control of [the] court and unforeseeable[, under circumstances in which] it becomes no longer possible to conduct [the] trial or to reach a fair result based upon the evidence. The United States Supreme Court has noted that there is no "standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Washington,* 434 U.S. at 506 [98 S.Ct. at 830–31].
>
> It is impossible to define all the circumstances [that] would render it proper to interfere by declaring a mistrial. Which of the variety of circumstances resulting in mistrial declarations rise to the level of "manifest necessity" so as to allow reprosecution has been the subject of much discussion.
>
> There are especially compelling reasons for allowing a trial judge to exercise broad discretion in deciding whether or not manifest necessity exists. Thus, great deference will be given to the trial court when it finds manifest necessity. Because manifest necessity is a high standard not to be declared lightly, a trial judge should record his or her reasons for declaring a mistrial and include the reasons for finding manifest necessity.
>
> When examining the record for evidence of manifest necessity, one factor to be regarded is whether the trial court sufficiently considered the alternatives. A trial court must consider the options available and factor them into the balance between the accused's rights and the public interest.

*Id.* at 204–06, 857 P.2d at 590–91 (some citations omitted) (some brackets added and some omitted) (some internal quotation marks omitted) (footnotes and ellipsis points omitted). *See also Minn,* 79 Hawai'i at 464–65, 903 P.2d at 1285–86. Thus, a trial court's declaration of a mistrial is not supported by manifest necessity if "less severe options were available that would have protected both [the defendant's] rights and the public's interest." *Lam,* 75 Haw. at 206, 857 P.2d at 591.[25]

■■ A plausible argument could be made in the present case that the trial court's declaration of a mistrial as to Count I was not supported by manifest necessity because "less severe options were available," *id.* at 206, 857 P.2d at 591, that would have protected both Quitog's rights and the public's " 'interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.' " *Id.* at 200, 857 P.2d at 589 (quoting *Moriwake,* 65 Haw. at 52, 647 P.2d at 710). For example, the trial court could have responded more substantively to the jury's communication of May 8, 1995, *see supra* at 564 and note 15, by clarifying the fact that, in accordance with its instructions, *see supra* notes 16 and 17, the states of mind requisite to the commission of assault in the first degree applied both to the defendant's conduct and to its result, *i.e.,* "serious bodily injury." Additionally, and inasmuch as the jury had effectively exhibited its inability to reach a unanimous guilty verdict as to the charged offense of attempted second degree murder, *see* section III.A.2, *infra,* the trial court could have instructed the jury to continue its deliberations regarding included offenses. On the record before us, however, we cannot say that the trial court's declaration of a mistrial based on manifest necessity constituted an abuse of discretion, and we therefore hold that it did not.

2. *Double jeopardy, the prosecution's tactical decision to abandon its case regarding the charged offense after the close of the evidence, and the jury's subsequent inability to return a verdict*

We now turn directly to Quitog's claim that, after taking the position at the close of

---

**25.** That being the case, "[e]ven though a 'hung jury' constitutes a 'classic example' of manifest necessity, a trial court must first consider less severe options available and balance the accused's rights against the public interest." *Minn,* 79 Hawai'i at 465, 903 P.2d at 1286 (citing *Lam,* 75 Haw. at 206, 857 P.2d at 591) (footnote omitted).

the evidence in his first trial that he was not guilty of attempted second degree murder and therefore effectively seeking to abandon its case regarding the offense charged in Count I, the prosecution should be precluded by principles of double jeopardy from "changing its position" thereafter by retrying him for attempted second degree murder.

The prosecution responds to Quitog's claim with the observation that "the [DPA's] argument that the evidence did not establish the requisite intent on [Quitog's] part and[,] therefore, [that Quitog] was not guilty of the charge of attempted murder was merely 'argument' and not a binding 'conclusion of law' as to the sufficiency of the evidence." The prosecution elaborates on its observation with the following analysis:

The [prosecution] submits that accepting [Quitog's] argument and theory is to accept the proposition that[,] henceforth, the [prosecution's] "admission" is binding upon the courts as a conclusion of law. No longer will it be the appellate court's function to pass upon the sufficiency of the evidence where the [prosecution] makes [an] "admission" in its closing argument that the evidence is insufficient to prove the elements of the charged offense. The "admissions" of the [prosecution], as expressed in its closing argument, will be all that is necessary for a dispositive determination as to the sufficiency of the evidence.

To accept [Quitog's] argument is to accept the inherent principle ... that the [DPA's] "admission" is binding upon the jury. Accepting [Quitog's] theory and argument is to accept the proposition that the State, as the party prosecutor, by simply expressing an "admission" in it [sic] closing argument as to the state of the evidence, will now serve in the place of the jury. The [prosecution] would henceforth be making all factual determinations previously the province of the jury. The [prosecution] would be deciding which evidence is to be accepted for making a determination as to all the elements of the charged offense....

Another principle of law which would no longer be applicable is found in the [trial] court's instruction to the jury. The [trial] court gave ... an instruction which, in part, stated:

Statements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence.

Under [Quitog's] argument and theory, the [prosecution's] argument to the jury would be elevated to a position of being not only persuasive, but would henceforth be controlling. Under [Quitog's] argument, the [prosecution's] argument to the jury would be binding on the jury[,] and the jury must not only "consider" the same, but ... must abide by the [prosecution's] recollection and interpretation as to what that evidence in the case was.

The [prosecution] submits that one of the far reaching effects of accepting [Quitog's] theory here is to eventually dispense with the jury system. The functions of the trier of the facts would be placed upon the prosecution to be exercised and expressed through its closing argument in the form of "admissions."

(Record reference omitted.)

Thus, according to the prosecution's "slippery slope" argument, in order for this court to hold, on the record in this case, that principles of double jeopardy preclude Quitog from being retried for attempted second degree murder as charged in Count I, it would be necessary for us to repudiate the longstanding propositions that (1) the arguments of counsel are not evidence, (2) the jury is the sole trier of the facts, (3) it is the exclusive province of the trial court to pass, as a matter of law, on the sufficiency of the evidence to submit to the jury, and (4) it is part of the appellate function to conduct an independent review of the sufficiency of the evidence to support a conviction. In trotting out its somewhat hyperbolic "parade of horribles," the prosecution simply misses the mark because none of the foregoing propositions is at risk in this appeal.

First, it is axiomatic that "the arguments of counsel are not evidence." *State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986).

However, a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.

*State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted). In other words, closing argument accords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom.

■ Second, this court has adhered for over 140 years to the fundamental principle, " 'which lies at the foundation of jury trial in every country blessed with that institution,' " that " 'the jury is to pass upon the facts and the court upon the law.' " *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 75 (1993) (quoting *Lewis v. Davis,* 1 Haw. 141, 142 (1854)) (brackets omitted); *see also State v. Williamson,* 72 Haw. 97, 103, 807 P.2d 593, 597 (1991) ("The function of the jury is to decide questions of fact[.]"). Thus, we have no quarrel with the notion that "[t]he jury is the sole judge of witness credibility and the weight of the evidence." *State v. Estrada,* 69 Haw. 204, 229, 738 P.2d 812, 828 (1987) (citation omitted); *see also State v. Riveira,* 59 Haw. 148, 154, 577 P.2d 793, 797 (1978).

Third, we acknowledge that

"[t]he standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

*State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (quoting *State v. Alston,* 75 Haw. 517, 528, 865 P.2d 157, 164 (1994)) (some brackets in original and some added).

Finally, fourth, we have repeatedly stated that

evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence *to support a conviction;* the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996) (citations and internal quotation signals omitted) (emphasis added); *see also Wallace,* 80 Hawai'i at 391–92, 910 P.2d at 704–05; *Pone,* 78 Hawai'i at 265, 892 P.2d at 458; *State v. Reed,* 77 Hawai'i 72, 81, 881 P.2d 1218, 1227 (1994); *In re John Doe, Born on January 5, 1976,* 76 Hawai'i at 92–93, 869 P.2d at 1311–12; *State v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 589 (1993); *State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992).

Quitog suggests in his appellate brief that, "[i]n the instant case, termination of the first trial was not brought about by trial error but by insufficient evidence." Quitog is half correct. Although the trial court's declaration of a mistrial as to Count I was not prompted by "trial error," *see supra* note 21, neither was it the result of a judicial determination of the "legal insufficiency" of the evidence. *See id.* Rather, the trial court's declaration was the product of the jury's advisement that it was deadlocked over the question whether Quitog was guilty of first or second degree assault, thereby giving rise to the trial court's assessment that there was a "manifest necessity" for a mistrial.

Indeed, nothing in the record on appeal indicates that Quitog's trial was marred either by "trial error" or by legally insufficient evidence. That is precisely why the trial court correctly denied Quitog's motions for a judgment of acquittal, ruled that the prosecution had made out a prima facie case as to all counts, and permitted the case to go to the jury for deliberations.[26] After listening to

---

26. Accordingly, had the jury convicted Quitog of

attempted second degree murder as charged in

the closing arguments of counsel, the jury deliberated and, as "the sole judge of witness credibility and the weight of the evidence," *see Estrada,* 69 Haw. at 229, 738 P.2d at 828, returned guilty verdicts as to the offenses charged in Counts II and III but deadlocked as to Count I after communicating its inability "to distinguish between Assault 1 and Assault 2"—offenses included within Attempted Second Degree Murder for purposes of HRS § 701–109(4). *See supra* notes 4, 9, and 10.

 On the other hand, the record also establishes that the DPA, in his effort to persuade the jury of the validity of the prosecution's case (and subjectively believing "that there was insufficient evidence to sustain the Attempted Murder in the Second Degree charge" and that, "in [his] role [as a prosecutor] to seek justice, . . . [it] was the proper thing to do"), "went out on a limb" by exhorting the jury "that it should find for the Defense not guilty as to Count One, Attempted Murder in the Second Degree . . ., but guilty of Assault in the First Degree." *See*

section I, *supra.* In doing so, the DPA effectively sought to take the charged offense of attempted second degree murder "off the table" by declining to prosecute the offense further [27] and pursuing a first degree assault conviction.

Although, for reasons that will be explored *infra* in this section, the DPA failed to obtain a first degree assault conviction, the record establishes that he succeeded in taking the charged offense of attempted second degree murder "off the table." As noted *supra* in section I.B, by agreement of the parties, the trial court instructed the jury, *inter alia,* regarding the included offenses of assault in the first and second degrees in connection with count I. *See supra* note 16. State's Instruction No. 6, as modified by agreement, advised the jury that it could consider whether Quitog was guilty or not guilty of assault in the first degree "[i]f and only if [it found] . . . Quitog not guilty of Attempted Murder in the Second Degree, or [if it was] unable to reach a unanimous verdict as to this offense[.]" *See id.*

---

Count I, or of an offense included therein, the posture of the present case would be quite different.

**27.** We have recognized for over one hundred years that the prosecuting arm of the executive branch cannot be forced to pursue any particular conviction. In *King v. Robertson,* 6 Haw. 718 (1889), this court stated:

The counsel for the Attorney–General says, in argument: "If the judicial power can be extended to requiring the Attorney–General . . . to prosecute any specified case on penalty of fine or imprisonment, this would not permit the exercise of executive and judicial powers to be preserved distinct; it would annul the discretionary and voluntary exercise of executive power, so far as the Attorney–General is concerned." This, in [the court's] view, is a misapprehension of the matter in discussion. *The [c]ourt has not ordered the prosecution of this case. It cannot and it will not do so.* It has simply refused to approve and allow a motion for *nolle prosequi* upon the reasons stated.

. . . .

. . . [The court] express[es] only an opinion that it is a case to be put to trial. But this the [c]ourt cannot order. If, when it is called for trial, the Attorney–General, being present in person or by deputy, does not prosecute, it will stand not prosecuted in fact, but without the entry of *nolle prosequi.* The Attorney–General will take his own course.

*Id.* at 730–31 (emphasis added) (some ellipsis points in original and some added). On the other hand, a motion for nolle prosequi may be granted or denied in the circuit court's discretion. HRS § 806–56 (1993), the progenitor of which was enacted in 1876, provides:

**Nolle prosequi.** No nolle prosequi shall be entered in a criminal case in a court of record except by consent of the court upon written motion of the prosecuting attorney stating the reasons therefor. The court may deny the motion if it deems the reasons insufficient and if, upon further investigation, it decides that the prosecution should continue, it may, if in its opinion the interests of justice require it, appoint a special prosecutor to conduct the case and allow the special prosecutor a fee. Section 802–5(b) relative to fees allowed counsel assigned by the court for a defendant is made applicable to fees of special prosecutors appointed hereunder.

Once placed in jeopardy, a criminal defendant is entitled to notice and an opportunity to be heard in connection with a motion for nolle prosequi. *State v. Estrada,* 71 Haw. 260, 264–65, 787 P.2d 692, 695, *reconsideration denied,* 71 Haw. 665, 833 P.2d 899 (1990). "[A] *nolle prosequi* entered over the defendant's objection, after jeopardy has attached, terminates the prosecution and bars any subsequent trial for the same offense." *State v. Murray,* 69 Haw. 618, 619, 753 P.2d 806, 807 (1988). *See also* HRS § 701–110(4) (1993); Hawai'i Rules of Penal Procedure (HRPP) Rule 48(a) (1996).

The jury's communication of May 8, 1995, *see* section I.D, *supra*, reflected that the jury was considering whether Quitog was guilty of first degree assault. This fact is significant in light of "the sound presumption of appellate practice that jurors are reasonable and generally follow the instructions that they are given," *State v. Loa*, 83 Hawai'i 335, 359, 926 P.2d 1258, 1282 (1996) (quoting *State v. Holbron*, 80 Hawai'i 27, 46, 904 P.2d 912, 931, *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995)) (brackets and internal quotation marks omitted).

We presume that the jury followed the circuit court's instructions and first considered the evidence with regard to the Attempted Murder charge. Consequently, the jury would first have considered the charged offense and would have gone on to consider any lesser offense only if [it was] unable to agree that the prosecution had proven that [Quitog] was guilty of the charged offense beyond a reasonable doubt.

*Id.* (quoting *Holbron*, 80 Hawai'i at 46, 904 P.2d at 931) (quotation signals omitted). "Thus, the fact that the jury reached the [first degree assault] instruction at all signifies that it was unable to convict [Quitog] of attempted [second] degree murder." *Id.* Given the DPA's abandonment of the prosecution's position that Quitog was guilty as charged in Count I, *see* section I.C, *supra*, this is hardly a surprise.

The jury's communications, however, establish not only that it was no longer considering whether Quitog was guilty of attempted second degree murder, but also that it ultimately deadlocked over whether Quitog had committed first or second degree assault. As we have noted, the communication of May 8, 1995 sought clarification as to whether it was necessary to find that Quitog had acted intentionally or knowingly with respect to the resulting "serious bodily injury" that he inflicted upon George Stanley in order to convict Quitog of assault in the first degree, as the DPA had exhorted it to do. *See supra* notes 15 and 16. The trial court's response that the jury should "please refer to the jury instructions" apparently failed to provide the needed clarification because the jury's com-

munication of May 10, 1995 advised the trial court that it required some "further explanation, definition and/or example regarding reckless[ness] in order to distinguish between Assault 1 and Assault 2." *See* section I.D, *supra*. In other words, the jury was indicating its inability to distinguish between *intentionally or knowingly* causing serious bodily injury (assault in the first degree), on the one hand, and *recklessly* causing the same result (assault in the second degree), on the other. Moreover, the communication unequivocally informed the trial court that the jury was "hung without further information or understanding." *See id.* Thirty-five minutes after been advised that "[n]o further definition of Reckless [could] be provided," the jury's final communication declared that it was, indeed, terminally "hung" as to Count I. *See id.*

Having had "one full and fair opportunity to present [its] evidence to an impartial jury," *see Lam*, 75 Haw. at 200, 857 P.2d at 589, and *Moriwake*, 65 Haw. at 52, 647 P.2d at 710, the issue before us devolves into the question whether, under the circumstances of this case and for purposes of article 1, section 10 of the Hawai'i Constitution, it would be "grossly unfair" to allow the prosecution to retry Quitog for attempted second degree murder. *See Lam*, 75 Haw. at 199, 857 P.2d at 588; *Washington*, 434 U.S. at 503, 98 S.Ct. at 829. We hold that it would.

Although there does not appear to be any precedent directly on point, various federal courts have barred retrials on double jeopardy grounds when the defendants's first trial has terminated without any determination of the defendant's guilt or innocence, and the prosecution's deliberate trial strategy was mutually exclusive with that which it sought to pursue on retrial. For example, in *United States v. Cavanaugh*, 948 F.2d 405 (8th Cir. 1991),

[t]he defendants were originally indicted for first degree murder in violation of 18 U.S.C. § 1111 (1988), assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(f) (1988), and other miscellaneous charges not material here. The defendants, who now appeal, were each found guilty of second degree murder. The jury

did not pass upon the assault charge. The jury was discharged and no mistrial was declared on the assault count. On appeal, [the] defendants obtained reversals of their convictions for second degree murder based on insufficient evidence.... Thereafter, upon motion of the government, the district court, without a new trial, entered judgments of conviction against each defendant [on the assault charge]....

. ....

... The government [had] conceded that the fatal injuries caused by the automobile running over [the victim] could not constitute the serious bodily injury of the assault charge, but [had] argued that the jury [had] found that the assault and beating before the run-over occurred [had] caused serious bodily injury apart from the fatal injuries. In the alternative, the government [had] asked for a new trial on the assault charge against the eight defendants. Without reviewing the evidence, the district court held that assault resulting in serious bodily injury was a lesser included offense of murder, and that under the trial court's instructions the jury [had] necessarily found the defendants guilty of assault resulting in serious bodily injury before finding them guilty of murder. The court [therefore] entered summary conviction against the defendants on Count II of the original indictment, assault resulting in serious bodily injury.

*Id.* at 407–08.

On appeal, the defendants contended, *inter alia,* that their assault convictions were barred "under double jeopardy principles." *Id.* at 408. The *Cavanaugh* court agreed. As a preliminary matter, the *Cavanaugh* court held that, under federal law, the trial court had "erred in finding that assault resulting in serious bodily injury under 18 U.S.C. § 113(f) was a lesser included offense of murder under 18 U.S.C. § 1111." *Id.* at 410. Accordingly, the *Cavanaugh* court held that, "[b]ecause the jury could have found that the assault [consisted of] running over [the victim] with the vehicle, there [was] no certainty that it also found that the defendants *independently* assaulted [the victim] and inflicted serious bodily injury before the

fatal injuries resulting from the run-over by the ... vehicle." *Id.* at 411 (emphasis in original).

The heart of the *Cavanaugh* court's analysis, however, is particularly germane to the present appeal:

We find that the government at trial abandoned any theory that there were two separate and distinct criminal acts....

The government presented this case as one in which the alleged assaults before the run-over were an integral part of the actual murder. It is clear that this was the only way the government could establish most of the defendants' culpability for the murder....

Having concluded that *the prosecution's deliberate action resulted in the trial terminating without a verdict on the* assault *charge,* we must determine whether the principles of double jeopardy now bar the government from retrying the defendants on that count. *We conclude that double jeopardy bars retrial under these circumstances.*

. ....

... *[T]he failure of the original jury to return a verdict* on the assault count *and the reasons it did not[ ] are the critical factors barring retrial.*

. ....

... In this case, the trial ended without a factual determination of guilt or innocence on the assault charge, and we look closely at precisely why the trial terminated without the jury reaching a verdict on the charge. Had the trial terminated because of a deliberate election by the defendant, double jeopardy would not bar retrial. *See United States v. Scott,* 437 U.S. 82, 96, 98 S.Ct. 2187, 2196–97, 57 L.Ed.2d 65 (1978). In contrast, *when the trial terminates without a determination of guilt or innocence on a charge as a result of a deliberate, tactical decision by the prosecution, we examine whether the interests protected by double jeopardy principles would be offended by a retrial.*

. ....

*We hold that principles of double jeopardy,* which serves "a constitutional policy

of finality for the defendant's benefit," *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality), *bar[ ] retrial for the* assault *charge when the government's deliberate trial strategy caused the first trial to terminate without the jury passing upon that charge. The prosecution could have presented the original jury with the theory it now wishes to advance on retrial. The defendants in this case should not be required to* " *'run the gauntlet' a second time." Ashe v. Swenson,* 397 U.S. 436, 446 [90 S.Ct. 1189, 1195, 25 L.Ed.2d 469] . . . (1970) (quoting *Green,* 355 U.S. at 190, 78 S.Ct. at 224 . . . .)

*Cavanaugh,* 948 F.2d at 413–17 (emphases added). *See also Sizemore v. Fletcher,* 921 F.2d 667, 673 (6th Cir.1990) (ruling that a second trial may be "barred by double jeopardy" if "the first trial ended without a verdict for reasons of the prosecution's making"); *Saylor v. Cornelius,* 845 F.2d 1401, 1403, 1408 (6th Cir.1988) ("[W]here the first trial ended without a verdict on the relevant charge for reasons of the prosecution's making, a retrial on that charge would violate the protection the Double Jeopardy Clause affords against harassing reprosecution. . . . We believe that the Double Jeopardy Clause forbids a second trial on [an alternative] theory because such a trial would be vexatious, regardless of the outcome of the jury's deliberation on the theory charged to it. It would be vexatious because the defendant underwent the jeopardy of a full trial, which is even more vexatious than the aborted or partial trials usually involved in double jeopardy cases, and the trial failed to terminate in a verdict for reasons that cannot fairly be charged to the defendant." (Citations omitted.)).

▮ Although they are factually distinguishable in certain respects, we expressly adopt the core analytical constructs of *Cavanaugh, Sizemore,* and *Saylor,* and apply them to the facts of the present case. As in *Cavanaugh,* the prosecution "abandoned" the theory that it "could have presented [to] the original jury" and that "it now wishes to advance [against Quitog] on retrial." *Id.* at

413, 417. As in *Cavanaugh,* "the trial terminate[d] without a determination of guilt or innocence on [the offense charged in Count I]" following "a deliberate, tactical decision by the prosecution." *Id.* at 416. Thus, as in *Cavanaugh,* "the failure of the original jury to return a verdict on the [attempted murder] count and the reason it did not[ ] are the critical factors barring retrial." *Id.* at 415.

Accordingly, as did the *Cavanaugh* court with respect to the federal double jeopardy clause, we hold that article I, section 10 of the Hawai'i Constitution "bars retrial for [a] charge when the government's deliberate trial strategy"—which is completely incompatible with another approach that it could have pursued, but expressly chose not to—accompanies the termination of "the first trial . . . without the jury passing upon that charge." *See id.* at 417. That being the case, we further hold that article I, section 10 forecloses the prosecution from retrying Quitog for attempted second degree murder, as charged in Count I of the complaint against him.

B. *On Remand Of Count I, Quitog May Be Retried For Lesser Offenses Included Within Attempted Second Degree Murder.*

▮ We have recently emphasized on several occasions that "remanding the case for retrial on *lesser included offenses* [ [28] ] offends neither the fifth amendment to the United States Consti tution nor article I, section 10 of the Hawai'i Constitution." *Wallace,* 80 Hawai'i at 414, 910 P.2d at 727 (citing *State v. Malufau,* 80 Hawai'i 126, 136, 906 P.2d 612, 622 (1995)); *see also Loa,* 83 Hawai'i at 361 n. 20, 926 P.2d at 1284 n. 20. We therefore hold that article I, section 10 does not foreclose the prosecution from retrying Quitog for any lesser offenses included within attempted second degree murder, as charged in Count I.

IV. *CONCLUSION*

For the foregoing reasons, we (1) vacate the circuit orders—filed on November 1,

---

**28.** *See supra* note 4.

1995 and November 2, 1995—in part, (2) instruct the circuit court to modify its orders so as to preclude Quitog from being retried for attempted second degree murder, as charged in Count I, while permitting a retrial with respect to any lesser included offenses, *see supra* note 4, and (3) remand this case to the circuit court for further proceedings consistent with this opinion.

