LAW LIBRARY

**NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

NO. 28749

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
ERIK R. PAREL, Defendant-Appellant.

K.HAMAKADO CLERK, APPELLATE COURTS STATE OF HAWAI'I

2010 SEP 23 AM II: 00

FILED

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 07-1-0415)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Reifurth and Ginoza, JJ.)

Defendant-Appellant Erik R. Parel (Parel) appeals from the Judgment dated August 22, 2007 entered in the Circuit Court of the First Circuit (circuit court)[1] convicting him of Attempted Extortion in the First Degree in violation of Hawaii Revised Statutes (HRS) §§ 705-500 (1993) and 707-765(1)(a) (1993) and 707-764(1)(f) (Supp. 2006) and/or 707-764(1)(g) (Supp. 2006) and/or 707-764(1)(k) (Supp. 2006). Parel was convicted following a jury trial.

Parel raises two points of error on appeal. First, he asserts that there was insufficient evidence to support his conviction because he proved an affirmative defense by a preponderance of the evidence. Second, Parel argues that the circuit court erred in denying his motion for a new trial because he was denied the right to effective assistance of counsel, claiming that his trial counsel (a) failed to confer with and properly advise him in preparation for trial, (b) failed to obtain an interpreter for him at trial, and (c) failed to conduct an adequate factual and legal investigation.

Based upon our careful review of the record and the briefs submitted by the parties, and having given due

---

[1] The Honorable Richard K. Perkins presided.

consideration to the arguments advanced and the issues raised by the parties, we affirm Parel's conviction.

## I.   Sufficiency of the Evidence at Trial

Plaintiff-Appellee State of Hawai'i (State) contends that Parel attempted to extort $80,000 from Dr. Nestor Del Rosario (Del Rosario), a physician who operates a clinic in Waipahu.   Parel counters that he established an affirmative defense because he believed that Del Rosario had lied or mistakenly diagnosed a patient without a proper examination, and that Parel's sole intention was to either compel or induce Del Rosario to pay him as restitution or indemnification for the harm done and/or to induce Del Rosario to take reasonable action to correct his mistake.   Significant and key facts in this case were highly disputed.

### A.   Relevant Statutes

In this case, the pertinent elements for criminal extortion are as follows:

§707-764 Extortion.  A person commits extortion if the person does any of the following:

(1)   Obtains, or exerts control over, the property or services of another with intent to deprive another of property or services by threatening by word or conduct to:

\* \* \* \*

(f)   Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt, or ridicule, or to impair the threatened person's credit or business repute;

(g)   Reveal any information sought to be concealed by the person threatened or any other person;

\* \* \* \*

(k)   Do any other act that would not in itself substantially benefit the defendant but which is calculated to harm substantially some person with respect to the threatened person's health, safety, business, calling, career, financial condition, reputation, or personal relationships[.]

HRS § 707-764.[2]

Criminal attempt is defined as: "[a] person is guilty of an attempt to commit a crime if the person . . . [i]ntentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime." HRS § 705-500(1)(b).

Parel asserts that he has proven the following affirmative defense:

[§707-769] **Defenses to extortion.** . . .

* * * *

(4) It is an affirmative defense to a prosecution for extortion as defined in paragraphs (1) and (2) of section 707-764 and as further defined by subparagraphs (e), (f), (g), and (i), that the defendant believed the threatened accusation, penal charge, or exposure to be true, or the proposed action of a public servant was justified, and that the defendant's sole intention was to compel or induce the victim to give property or services to the defendant due the defendant as restitution or indemnification for harm done, or as compensation for property obtained or lawful services performed, or to induce the victim to take reasonable action to prevent or to remedy the wrong which was the subject of the threatened accusation, charge, exposure, or action of a public servant in circumstances to which the threat relates.

HRS § 707-769 (1993 & Supp. 2006). For purposes of an affirmative defense, "the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability." HRS § 701-115(2)(b) (1993).

B.    **Summary of Relevant Evidence**

Del Rosario Testimony

Del Rosario testified that on June 19, 2006, he examined and treated a care home patient (Patient) with multiple medical problems whom he saw for regular follow-ups. Patient was

---

[2] The requirements for Extortion in the First Degree are: "[a] person commits the offense of extortion in the first degree if the person commits extortion . . . [o]f property or services the value of which exceeds $200 in total during any twelve-month period[.]" HRS § 707-765 (1993).

brought in by a care giver who informed Del Rosario that Patient had what looked like a rash on her right hip. Del Rosario testified that, while Patient was seated in her wheelchair, he examined the area of the rash. He did not place her on the examination table because her weight and medical condition made it difficult. He was informed by the care giver that there were no openings on the skin, just a rash. Del Rosario prepared a progress note of this examination, which contained a description of "rash/sore right buttocks" and an assessment of "decubitus".[3]

Del Rosario testified that on June 26, 2006, Parel came to his office and insisted on meeting with him. They entered a consultation room and Del Rosario claims that Parel locked the door and accused Del Rosario of lying on the progress note for Patient by assessing "decubitus" and that Del Rosario had not examined Patient. Parel told Del Rosario that his wife operated the care home that took care of Patient. According to Del Rosario, Parel then put a bunch of keys in front of Del Rosario and stated "you know why I'm rich, because I'm smart and I'm very powerful because I know a lot of people." Parel then allegedly said the "Gallegos" are very close to him and "because [Del Rosario] lied he will bring [Del Rosario] down." Del Rosario told Parel that he could provide a "qualifying note" to explain the progress note regarding Patient. According to Del Rosario, Parel said it was about time he "brings [Del Rosario] down because [Del Rosario is] so popular" and that Parel "will call

---

[3] Witness testimony varied on what the term "decubitus" meant. Del Rosario testified that there were four stages of decubitus: Stage I (redness that looks like a rash with no opening of the skin), Stage II (opening of the skin that can extend into the subcutaneous tissue); Stage III (open skin that could extend into the muscle); and Stage IV (open skin that could extend as deep as the bone). Jeri Nakamura (Nakamura), a social worker with Ohana Case Management, testified she was not aware of the stages of decubitus but that her interpretation from working in a hospital setting was that it involved an open sore or an ulcer, and not a rash. Nakamura testified that a doctor's diagnosis of decubitus would lead her to believe there may be neglect and she would report it to a registered nurse for assessment. She also testified that a report of a patient having bed sores could be very damaging to a care home provider. Parel testified that a doctor's diagnosis of decubitus for a patient of his care home would be very damaging to the business.

the Action Line, Medicare, HMSA, and all the insurances that we deal with in our offices." Parel also said he would have Del Rosario's license taken away.

Del Rosario testified he was in shock and asked Parel what he wanted, if he wanted money. Parel "just smiled." During this exchange, Del Rosario also testified that Parel told him "remember I am here to help you" and that is when Del Rosario said "$10,000." Parel laughed and said "you're a doctor and you're offering me $10,000." Del Rosario then said "$25,000." According to Del Rosario, Parel replied that with Del Rosario losing his license, "there's so much at stake that [Del Rosario] could find more than that. [Del Rosario] could go make [his] rounds, meaning asking from other doctors to come up with more money." Del Rosario testified that Parel wanted $80,000 and "[h]e said he could have asked for more but because we're both Filipinos and [sic] he's trying to help me." Parel told Del Rosario to come up with the money within 48 hours. Before leaving Del Rosario's office, Parel told Del Rosario to call him the following day about the status of the money.

Del Rosario conferred with his office and business managers and was put in contact with Honolulu Police Department (HPD) Detective Timothy Mariani. Detective Mariani suggested that the only way to prove what Parel was doing was to make the call the next day and have it recorded. The next day, June 27, 2006, Detective Mariani came to Del Rosario's office and set up a recording device on Del Rosario's phone. Del Rosario placed the expected call to Parel and the conversation was recorded. See *infra* for transcript of the recorded call.

Del Rosario testified that the following day, June 28, 2006, another HPD Detective, Michael Ogawa, was in Del Rosario's office to try to record a second telephone conversation between Parel and Del Rosario when Parel unexpectedly arrived at Del Rosario's office. Parel indicated to Del Rosario that he wanted to go into one of the back rooms. Once in the room, Parel asked "where's my money". Del Rosario told Parel he did not have all

5

of the money and Parel asked how much he had. Del Rosario responded that he had $40,000 but that it was in a plastic bag in a room where he was examining a patient. Del Rosario asked Parel to leave, but Parel insisted on waiting until Del Rosario was done with the patient. Del Rosario proceeded to the next room and apprised Detective Ogawa of the situation. Detective Ogawa called for back up who arrived shortly thereafter and arrested Parel.

### Parel Testimony

Parel testified that he is a certified nursing assistant and he started a care home with his wife in 2003 which his wife now operates. Patient resided at the care home and Parel learned of Del Rosario's progress note on June 24, 2006 when Jeri Nakamura (Nakamura), a social worker with Ohana Case Management, did a reassessment examination of Patient and pointed out the progress note to Parel. Parel and Nakamura examined Patient and found no decubitus on June 24, 2006.[4]

Parel testified that he then spoke with Deb Clanton, the care giver who took Patient to see Del Rosario. Clanton informed him that Del Rosario did not examine Patient's buttocks on the day of their visit. At Parel's request, Clanton wrote a statement of what she observed at Del Rosario's office.[5] On

---

[4] Nakamura testified at trial that she did periodic evaluations for individuals like Patient who were admitted to an adult foster home. On June 24, 2006, she did an evaluation for Patient and prepared an assessment report that stated: "[Patient] has monthly visits to Dr. Nestor del Rosario's office. His most recent note on 6/19/06 indicated rash/sore on right buttocks and his assessment of decubitus. Upon caregiver & this LSW's examination, no decubitus on buttocks seen on 6/24/06."

[5] Clanton testified at trial that she worked for Parel and his wife as a substitute care giver and that she took Patient to her visit with Del Rosario. She informed Del Rosario that Patient had a rash on her buttocks. Clanton testified that she remained with Patient throughout the visit with Del Rosario and that Del Rosario did not examine the rash. At the request of Parel and his wife, Clanton wrote a statement of what she saw when she took Patient to see Del Rosario.

June 25, 2006, Parel met with Mila Batalone (Batalone),[6] his case manager who sends patients to his care home, to discuss the discrepancy involving Del Rosario's progress note. Parel was concerned because the assessment of decubitus would affect his care home business. Batalone told Parel to go to Del Rosario's office to show him the progress note that they wanted amended.

Parel testified that he went to Del Rosario's office because he wanted the progress note amended. He denied locking the door when they entered the room. Parel testified he was not angry, but that Del Rosario got angry when Parel accused him of lying on the progress note and not examining Patient. Parel denied that he told Del Rosario that he is an important, powerful and rich person. Parel also denied saying he would make Del Rosario lose his license, but admitted saying he would report Del Rosario to Action Line because of Del Rosario's mistake. Parel testified he smiled when Del Rosario asked if he wanted $10,000 because "it's so ridiculous" and then Del Rosario said $20,000. To get the $20,000, Del Rosario wanted Parel to "take out" Clanton's statement. Parel testified that "everybody wants money" but denied asking for more money or saying he wanted $80,000.

In explaining the call with Del Rosario that was recorded, Parel testified in part that he was not worried that he was doing something wrong because Del Rosario is the one who kept talking about money and he thought maybe Del Rosario was doing something wrong, that maybe Del Rosario was bribing him.

Recording of Telephone Call Between Del Rosario and Parel

The transcript of the telephone call on June 27, 2006 between Del Rosario and Parel was admitted into evidence. The jury thus had evidence of the conversation, including:

---

[6] Transcripts from Parel's testimony indicate a last name spelling of "Batalon", while other portions of the record indicate a spelling of "Batalone".

MD:     Hey, Eric.

Eric:   Yo.

MD:     Yeah, Dr. del Rosario, here.

Eric:   Uh-huh.

MD:     Your last name, was it Parel or Parcel?

Eric:   Parel.

MD:     Parel, okay.

Eric:   Yeah, why?

MD:     I'd been making my rounds.

Eric:   Uh-huh.

MD:     Of course, it is very difficult to come out with that amount, but I'm still trying to get it 'cause you told me its 48 hours.  I got some, from my contacts and they were asking what it is for, but course, I just told them because I owe some money on my house.

Eric:   You know, Doc...it's like this...Doc...because we don't want to talk about it.  I'm only helping you.  I don't want us to be talking about this on the phone...because you might be recording me.  I'm helping you, right?

MD:     You're kind to help me.

Eric:   Yes, I'm just helping you, but...because...what time are you coming...because...I don't know.  What time are you coming?

MD:     Well, I'm trying to make my rounds still to find more money.

Eric:   Uh-huh...how much do you have?

MD:     Well, I probably have about 25 right now.

Eric:   So, what within 48 hours?  You'll be here to make rounds?  You'll be here to see my patients?

MD:     Well, I have to come to see them at your house?

Eric:   That's how we do it, then, we do it.  I'll have it removed, we'll fix it.  Don't you want it done this way?  How do you want it done?

MD:     If all the records are all removed.

Eric:   Yes, of course, it will really be all taken out.  You'll have to assess, reassess.  This is what we gonna do; it is better.  I'll put it like you made mistake so that....

MD:     I come and reassess the patient and what about my notes?  You'll throw away the notes?

Eric: Of course, it has to be removed, doc.  I'm helping you.

MD:   Including the....

Eric: This is how we talk, if you have it, so it is done faster.
      I'm worried because she wants to go...my wife...she keeps
      asking and asking if you're being truthful of what you're
      saying...if not, 'let me know,' she said again.

MD:   What about the nature of the caretaker that came?

Eric: Of course, I'll take it out, I'll make it disappear.

MD:   Okay.

Eric: Yeah...that's the...I'm just helping you, but it has to be
      out of the record.  You might be recording what we talk
      about.  Anyway, I don't have anything....

MD:   No, I'm all by myself.  I'm ashamed to have the other people
      outside hear about it.

Eric: Yes, only between you and me...Please Doc, I'm just helping
      you, right?

MD:   Yeah.

Eric: When is it possible to....

MD:   Well, you said 48 hours.  I have to...that's why I'm having
      my clinics early so that I can go around and find the money
      that you need.

Eric: Please don't say that...because...this might be a live
      recording.  I don't want you saying that, you know.

MD:   I have to learn my lesson from this.

Eric: That's why.  That's why...(inaudible)

MD:   What exactly did I really do?

Eric: I don't know.  I don't know.  I don't know.  I don't want to
      talk about it.  What we talk about is if you have it, just
      come.  Just come.  No more drama.  I don't want too much
      drama.  Anyway, I'm just helping you.  If you want or not, I
      don't know, you know.  The worse may happen to us - to cut
      short, to finish everything, remove everything.  Then,
      everything is finished...don't want anymore....Doc...remove
      everything, so no more problem for you, no more problem for
      us.

MD:   Can you make a little reduction?

Eric: Doc, you're the doctor, remember?  You know what I mean;
      you're a doctor, Doc.

MD:   So, you're really firm with $80,000.  Ahhh...I'll try to
      find the rest.

Eric: Make the arrangement when it is going to be.  I like it when
      no people are around.

9

MD:  That's why.  That's why I'm cutting off my offices early so I can....

Eric: You're all by yourself in your room, Doc?

MD:  Yeah, that's why I closed it because there's no more patients.

Eric: Yes, yes.  So what, until this afternoon?  I'll wait or what....

MD:  I'll call you again later when I find more.

Eric: Yes, so our problem will be finished.

MD:  Okay.

C.  **Evidence Adduced At Trial Was Sufficient To Support The Jury's Verdict**

We review the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury.  The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (brackets in original) (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)); see also State v. Pineda, 70 Haw. 245, 250, 768 P.2d 239, 241-42 (1989).  Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  Richie, 88 Hawai'i at 33, 960 P.2d at 1241 (citation omitted).  In reviewing sufficiency of the evidence to support a conviction, we recognize that it is within the province of the jury to "determine credibility, weigh the evidence, and draw justifiable inferences of fact from the evidence adduced[.]" State v. Naeole, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980) (citation omitted).

In this case, as is evident from the summary of evidence above, many of the facts were in dispute.  However, based on the evidence adduced at trial, including the testimony

of Del Rosario and the recorded telephone conversation on June 27, 2006, there was substantial evidence to support the jury's verdict convicting Parel of attempted extortion and sufficient evidence for the jury to conclude that Parel had failed to prove his affirmative defense.

## II. Claim of Ineffective Assistance of Counsel

After the jury's verdict below, Parel obtained new counsel and, pursuant to Rule 33 of the Hawai'i Rules of Penal Procedure (HRPP), filed a motion for new trial asserting that his trial counsel had rendered ineffective assistance of counsel. A hearing was held on July 18, 2007, and on August 7, 2007, the circuit court issued its order denying the motion for new trial.

### A. Standards of Review

On appeal, we review a trial court's ruling on a motion for a new trial for abuse of discretion.

> "[T]he granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *State v. Yamada*, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005) (citation omitted). It is well-established that an abuse of discretion occurs if the trial court has "clearly exceed[ed] the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citation omitted).
> Furthermore, at a hearing on a motion for new trial, the trial court acts as the trier of fact. *State v. St. Clair*, 101 Hawai'i 280, 287, 67 P.3d 779, 786 (2003) (citation omitted).

State v. Hicks, 113 Hawai'i 60, 69-70, 148 P.3d 493, 502-03 (2006) (brackets in original).

The standard for claims of ineffective assistance of counsel is "whether, viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases." Dan v. State, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (internal quotation marks, citation, and brackets omitted). "[M]atters presumably within the judgment of counsel, like *trial strategy*, will rarely be second-guessed by judicial hindsight." State v. Richie, 88 Hawai'i at 39, 960 P.2d at 1247 (1998) (internal quotation marks and citation omitted) (emphasis in original).

11

> The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test:  1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.  To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice.

State v. Wakisaka, 102 Hawaiʻi 504, 514, 78 P.3d 317, 327 (2003) (internal quotation marks, citations, and footnote omitted).

> B.  **Parel Has Failed To Establish Ineffective Assistance of Trial Counsel**

> 1.  **Preparation For Trial**

Parel first contends that his trial counsel failed to adequately meet with him and prepare for trial.  In a short declaration in support of the motion for new trial, Parel's only statement in this regard is: "Mr. Glenn and I had very limited contact prior to the day before the trial when he called me and told me to come to court for the trial."  At the hearing on the motion for new trial, no testimony was submitted by either party. In particular, Parel did not provide any further statement or testimony to elaborate on this claim or how he believed it affected the trial or his defense.

In the circuit court's order denying the motion for new trial, the court made findings of fact that, prior to trial, Parel appeared at least three times in court with his trial counsel for arraignment and pretrial matters and at no time did Parel request new counsel or inform the court of any problems with trial counsel.  We conclude that the circuit court's findings are not clearly erroneous and that Parel has not met his burden as to this first contention.

> 2.  **Alleged Failure To Obtain An Interpreter**

Parel's second contention is that his trial counsel failed to obtain an interpreter for him.  Regarding this issue, Parel's declaration states: "I told Mr. Glenn that I believed I needed an interpreter for the trial as English is my second

12

language.  He told me that it was a simple case and that I did not need an interpreter. . . .During the trial, there were things said in English that I did not understand."  At trial, Parel testified that Ilocano is his first language but that he understands English:

Q.    Is English your first language?

A.    Second.

Q.    What's your first language?

A.    Ilocano.

Q.    You understand English enough to communicate though; right?

A.    Uh-huh

Q.    Okay

A.    But I'm sorry if not clearly good in English, right.

Q.    If you don't understand a question that I ask, feel free to tell me so I can ask it in a way you do?

A.    Okay.  Sorry about that.

The circuit court's order denying the motion for new trial included findings of fact, such as: at three pretrial court appearances, Parel did not request an interpreter; at trial, Parel voluntarily and with a full understanding of his rights testified and did not request an interpreter.  The circuit court also made a finding that: "During his testimony, Defendant Parel was asked and answered questions in English.  At no time did he say to anyone that he did not understand English.  He answered questions without hesitation or any indication that he did not understand."

The circuit court concluded that: "[b]ased upon its review of transcript [sic] of Defendant Parel's trial testimony and the Court's independent recollection of that testimony itself, Court finds that Defendant had sufficient command of the English language to understand questions posed during the proceedings and to convey his thoughts to the jury."

From our review of the record, the circuit court's findings of fact were not clearly erroneous. Parel has not established that trial counsel's alleged decision not to obtain an interpreter constituted ineffective assistance and therefore the circuit court did not abuse its discretion in denying a new trial on this basis. See State v. Faafiti, 54 Haw. 637, 638-39, 513 P.2d 697, 699-700 (1973) (where defendant asserted he was not completely familiar with English and claimed he was improperly denied an interpreter, court held that "[a]lthough the defendant did not speak grammatically correct English, upon review of the transcript of the defendant's testimony, we are satisfied that he had sufficient command of the English language to understand questions posed during the proceedings and to convey his thoughts to the jury[.]").

### 3. __Alleged Failure To Investigate The Case__

Parel's third contention on appeal is that trial counsel failed to conduct a careful legal and factual investigation, primarily in his failure to call Milagros Batalone as a witness. At the hearing on the motion for new trial, Batalone was present but did not testify. Instead, an offer of proof was accepted by the State that she would have testified at trial that she told Parel to go to Del Rosario's office to clear up the dispute about the progress note. We agree with the circuit court's conclusion that:

> While Batalone's testimony would have corroborated Defendant Parel's testimony that Batalone told him to go to Dr. Del Rosario's to try to get the doctor to amend the progress note, there was no real dispute at trial that Defendant Parel did in fact go to the Doctor's office and confront him about the progress note. The real issue was whether Defendant went further and demanded $80,000.00 from [] Dr. Del Rosario. Batalone's testimony would have added little if anything to Defendant Parel's case on that issue. Also, "the decision whether to call a witness in a criminal trial is normally within the judgment of counsel and, therefore, will rarely be second-guessed by judicial hindsight." State v. Aplaca, 74 Haw. 54, 70 (1992).

Therefore, we conclude that Parel has failed to establish that his trial counsel was ineffective on this basis.

## III. CONCLUSION

Based on the above, we affirm the Judgment dated August 22, 2007 convicting Parel of Attempted Extortion in the First Degree.

DATED:  Honolulu, Hawai'i, September 23, 2010.

On the briefs:

Michael Jay Green
for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge

15